(105 App. Div. 208.)

PATCH et al. v. SMITH.

(Supreme Court, Appellate Division, Third Department. May 23, 1905.)

1. SALES—CONTRACTS—MEMORANDA—CONSTRUCTION.

A lumber dealer purchased a car of lumber, giving as evidence of his purchase a memorandum reciting the same and its terms. This memorandum was written upon the face of a printed blank prepared and used by the dealer in transactions with his customers, and which was not appropriate for use when he ordered lumber from another. It contained, with other printed matter, above defendant's name, a clause reciting that "this order is subject to acceptance at the main office." *Held*, that the quoted clause formed no part of the contract for the purchase of the lumber, but the written memorandum was to be regarded as complete in itself, and as if written on blank paper.

2. SAME—SALES OF SPECIFIC GOODS—QUALITY.

Where a buyer, through his agent, examined and purchased a pile of lumber as it stood, the questions of the quality and grade of the lumber were immaterial, in an action by the seller for the purchase price.

3. SAME—EVIDENCE OF SALE.

In an action by a seller to recover the purchase price of lumber, evidence *held* to show that the buyer had, through his agent, examined the pile of lumber, and purchased it as it stood, and had not merely ordered it subject to inspection and future acceptance.

Appeal from Trial Term, Tioga County.

Action by Henry W. Patch and another, as administrators, etc., against Mason M. Smith. From a judgment for plaintiffs, and from an order denying a new trial, defendant appeals. Affirmed.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

Lewis T. Payne, for appellant.
H. A. Clark, for respondents.

CHESTER, J. The action is one brought to recover the purchase price of a pile of oak and cherry lumber alleged to have been sold and delivered to the defendant by the plaintiffs. It appears that the lumber was piled in one pile in a millyard, and that Robert C. Patch, one of the plaintiffs, and the defendant's agent, one Knibbs, went to the pile September 7, 1903, and examined the lumber. The plaintiff's claim is that the pile was sold to the defendant on that day. The defendant's claim is that the pile was simply ordered that day, and that it was subject to inspection and acceptance thereafter.

It appears that, after the examination by the defendant's agent of the pile, he delivered to Patch a memorandum as follows:

"M. M. Smith.                                        Sept. 7, 1903. ·
"Bought of H. W. & R. C. Patch, Berkshire, N. Y., One car 4–4 oak, as shown, at $24. F. O. B. on car Richford, to include 2 M. 4–4 cherry at $25.00 F. O. B., bark edges to be measured off.
                            "D. C. Knibbs, Agt. for M. M. Smith."

This memorandum was written upon the face of a printed blank which was evidently prepared for and used by the defendant when his customers ordered lumber from him, but which was not appropriate for use when he ordered from another. It contained, printed with other printed matter over the defendant's name, in a paragraph at the bottom, "This order is subject to acceptance at the main office." We think this paragraph formed no part of the contract, and that the memorandum of sale is to be regarded as complete in itself, and the same as if written on any other piece of paper.

On September 24, 1903, the plaintiffs caused the lumber to be loaded on a New York Central car at Richford. It was shipped to the defendant at Rochester. When the lumber was received at. Rochester the defendant paid the freight on it, and it was unloaded from the car. About a month afterwards the defendant wrote to the plaintiffs, complaining of the quality and measurement of the lumber. He declined to pay for it, and this suit ensued.

There is a conflict in the evidence as to what occurred between Knibbs and Patch at the pile. Patch testified, in substance, that Knibbs said that, if there were any mill culls in the lot, he would

want to measure them out; that he (Patch) refused to consent to this, and said that he did not understand the grading of lumber, and that he would have to sell it as a pile, as he had no way of knowing what a mill cull was, but that he would throw out anything that was a thoroughly poor board. Patch also testified that Knibbs "asked me, after seeing the lumber, what we wanted for it, and I said $24 per M for the oak, and $25 for the cherry, and it was accepted there and then. * * * He stated that he would make out an order after we got back to Berkshire, and he did so." When they returned to Berkshire, Knibbs made and delivered to Patch the memorandum above mentioned. Knibbs testified that he told Patch that the order would have to be confirmed by Smith, the defendant. This, however, is denied by Patch. The defendant claims that Patch made representations as to the quality of the lumber in the pile, which he relied upon, that the lumber was not in fact of the quality represented, and that in the conversation which ensued there was an agreement that the lumber should be measured and accepted by one Japhet. It appears, however, that neither Japhet's name, nor any question over the inspection or measurement, arose until some time after the delivery of the memorandum of purchase, and what there was about that matter appears wholly by the correspondence which ensued. It is entirely clear from such correspondence that there was never an agreement between the parties making measurement or inspection by Japhet a condition precedent to the delivery of the lumber, or to the passing of the title of it to the defendant. Except the conversation between Patch and Knibbs upon the day of the alleged sale, all communications between the plaintiffs and the defendant were by corerspondence. This, to my mind, shows very clearly that the plaintiffs' theory of the controversy is the correct one.

In the first letter written by the defendant to the plaintiffs, under date of September 8, 1903, he alludes to the memorandum made by Knibbs as a "memorandum order for car of 4-4 white oak he purchased of you at $24.00," and also that "he has also purchased about 2000 ft. of inch cherry at $25.00 to go in the same car." This letter also contains the following: "Now when will you be ready to ship this? We see no reason why you cannot measure this yourself and if there is any slight variation we can correct it at the other end." In the reply to this letter, the plaintiffs, under date of September 11th, call attention to the fact that the lumber was not white oak, but was red oak, and suggested the name of Mr. Japhet as a reliable man to measure the lumber. It appears that Japhet was communicated with by the defendant, after which the plaintiffs wrote the defendant, under date of September 17th, that Japhet had informed them that the defendant wished him to grade the lumber as No. 1 and No. 2, etc.; and in that letter plaintiffs informed the defendant that Knibbs said nothing to them about No. 1 and No. 2, and that their understanding of the deal was that they sold the lot for $24, "except only the measuring off of bark edges and throwing out anything that is really a poor board." In reply to this letter, under date of September 18th, the defendant wrote, stating:

"The reason we asked to have Mr. Japhet grade this stock was simply to determine how it run for quality; that is, how much good there was and how much common, so that our customer would know just how it ran before he received the car and know what disposition to make of it. As you are aware, one lot of oak might run a good deal poorer than another, hence our requesting him to give us an inspection would have nothing to do with our purchasing of you at all, for we purchased this pile run."

This letter would seem to be conclusive against the contention of the defendant. Much of the trial was taken up with expert testimony as to the quality of the lumber when it was received at Rochester, but, if the plaintiffs' theory of the sale is correct, the question of quality and grade were wholly immaterial, for the defendant had, through his agent, examined the pile, and purchased it as it was, or "pile run."

The conflicting theories of the parties, and the conflicting evidence in support thereof, were fairly submitted to the jury by the trial justice in his charge; and I think their verdict in support of the plaintiffs' contention is abundantly supported by the evidence, and therefore that the judgment should be affirmed, with costs. All concur.